UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| gpac, LLP, | 4:21-CV-4201-LLP |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| BLAKE ANDERSEN and CYBERCODERS, INC., | |
| Defendants. | |

Pending before the Court are Defendant, Blake Andersen's ("Andersen") Motion for Judgment on the Pleadings (Doc. 19) and Defendant, CyberCoders, Inc.'s ("CyberCoders") Motion for Judgment on the Pleadings (Doc. 24.) For the following reasons, the motions will be denied.

## BACKGROUND

Gpac is a recruiting company that provides personnel placement services. (Doc. 1-1, Complaint, ¶ 1.) Gpac is a limited liability partnership with its principal place of business in Lincoln County, South Dakota, but gpac does business throughout the United States. (*Id.* ¶¶ 1, 5.) Andersen, a Colorado resident, formerly worked as a recruiter for gpac. On January 17, 2019, Andersen signed an Account Executive Employment Agreement ("Agreement") with gpac. A copy of the Agreement is attached as Exhibit A to the Complaint. (Doc. 1-1.)

Pursuant to the Agreement, Andersen was employed at gpac's "Office," which is defined at its location in Sioux Falls, South Dakota. (Agreement §§ 1.1 and 2.1.) In its Answer to CyberCoder's Counterclaim, gpac admits that "Andersen lived and worked in Colorado while employed by gpac at the time he resigned from gpac," but gpac asserts that "Andersen lived and worked in South Dakota when the Agreement was executed." (Doc. 7, Answer to Counterclaim, p. 4, ¶ 19.) In his Memorandum in Support of Motion for Judgment on the Pleadings, Andersen admits that he signed the Agreement while working for gpac in South Dakota. (Doc. 20, p.10.) And again, in his Reply Brief, Andersen states:

Although Blake executed his EA while he lived in, and worked for GPAC, in South Dakota, he was intentionally transferred by GPAC to Colorado. By opening an office in Colorado, and by hiring Colorado residents to work for the company, GPAC assumed the legal obligation to follow Colorado's employment laws. While Blake's EA may not have been void when it was first executed, it became avoidable and unenforceable once GPAC chose to have Blake and others live and work for it in Colorado.

(Doc. 30, p. 7.)

The Agreement contains four provisions that are relevant to the breach of contract allegations in Count 1 of the Complaint. The first is a nondisclosure provision in Section 8 of the Agreement which prohibits employees from using or disclosing "to any person the Company's Proprietary Information either during or after Employee's employment." (Agreement § 8.2.) This provision also requires employees to return Proprietary Information to gpac upon termination of employment, and to delete such information from their personal property and social media sites. (*Id.* at § 8.1.) "Company's Proprietary Information" is defined elsewhere in the Agreement as "the Company's confidential information" including a long list of items ranging from customer lists, identity of candidates and clients, billing rates, computer programs and data, to "all such information developed by its employees, whether or not during working hours, that is related to the Company's business." (Agreement § 1.12.) The Agreement reflects that gpac considers its Propriety Information as constituting "trade secrets." (*Id.*)

The second provision is a non-solicitation covenant in Section 9 of the Agreement which provides:

For a period of two years following the effective date of the termination of the Employee's employment, the Employee shall not, in the course of the personnel placement service business, solicit or provide services to any client, interim employee or candidate or solicit for employment or employ any interim employee or candidate, who resides in the United States, and who contacted the Company or had been contacted by the Company for personnel placement service business and shall not assist, directly or indirectly, any other person other than the Company in so doing, provided that the Company remains in the personnel placement service business in the United States.

(Agreement § 9.)

The third provision is a convenant not to compete in Section 10 which prevents the employee from engaging "in the activities of an Account Executive, outside sales representative,

2

coordinator, research assistant, project coordinator, manager, or trainer in the personnel placement service business within a two hundred mile radius of the Office, any Remote Office, or any Home" for a period of two years following termination of employment with gpac. (Agreement §§ 10.1, 10.1.1.) "Office" is defined as "the office of the Company located at 116 West 69th Street, Sioux Falls, South Dakota. (*Id.* § 1.1.) The "Remote Office" is "any location approved by the Company in which the employee is regularly doing business on behalf of the Company other than the 'Office.'" (*Id.* § 1.2.) "Home" means "any location which is the employee's primary residence at any time while the employee is employed by the Company." (*Id.* § 1.3.)

Finally, under Section 12 of the Agreement, the employee agrees not to induce any other employees of gpac to quit their employment with gpac or otherwise contribute to other employees violating their contractual obligations to gpac. (Agreement § 12.2.)

Andersen resigned employment at gpac on January 4, 2021. (Complaint ¶ 14.) He went to work for CyberCoders as an Executive Recruiter on or about September 2021. (Doc. 5, Answer and Counterclaim by CyberCoders, p. 11, ¶¶ 18-19.) CyberCoders, a California company with its principal place of business in Irvine, California, is a nationwide permanent placement recruiting firm. (Doc. 5, p. 9, ¶ 8.)

Gpac originally brought this action in the Second Judicial Circuit Court, Lincoln County, South Dakota on October 20, 2021. (Doc. 1-1.) On November 23, 2021, CyberCoders removed the case to this Court pursuant to 28 U.S.C. §§ 1441 and 1446 based on diversity jurisdiction. (Doc. 1.)

Gpac asserts five counts in its Complaint. The breach of contract claim in Count 1 alleges that Andersen breached Sections 8, 9, 10 and 12 of the Agreement:

> Employee has breached the Agreement through: (a) using or disclosing gpac's confidential information in violation of Section 8 of the Agreement; (b) solicitation of gpac's current or prospective clients and candidates within two years of termination of employment with gpac within the restricted geographic area in violation of Section 9 of the Agreement; (c) being employed by or in a service relationship with New Employer within two years of termination of employment with gpac within the restricted geographic area in violation of Section 10 of the Agreement; or (d) engaging in acts to induce other gpac employees to terminate their employment with gpac or otherwise contributing to other employees of gpac violating their contractual obligations to gpac.

3

(Doc. 1-1, Complaint, p. 3, ₱ 17.) In Count 2 of the Complaint, gpac asserts that both Andersen and CyberCoders misappropriated gpac's trade secrets. Count 3 is a claim against CyberCoders for tortious interference with gpac's Agreement by hiring and continuing to employ Andersen. Gpac asserts an unfair competition claim against both Andersen and CyberCoders in Count 4. Finally, gpac seeks punitive damages from both Defendants in Count 5 of the Complaint.

Andersen filed an Answer to the Complaint. (Doc. 16.) CyberCoders filed an Answer and a Counterclaim seeking, among other things, a declaration that the restrictive covenants in the Agreement are unenforceable. (Doc. 7.) Both Defendants now move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

Defendants argue that Colorado law governs the Agreement based on Andersen's residence in Colorado for the majority of his employment with gpac, and that the Agreement is unenforceable under Colorado law. Alternatively, Defendants argue that, even if South Dakota law applies, Andersen is still entitled to judgment in his favor on gpac's breach of contract claim, and thus CyberCoders also is entitled to judgment in its favor on gpac's tortious interference with contract claim because that claim is premised on an Agreement that is invalid and unenforceable. Defendants further argue that Count 2, misappropriation of trade secrets, is not supported by sufficient facts alleged in the Complaint, and therefore they are entitled to judgment on that claim. Andersen also contends that Count 4, unfair competition, is not a separate, independent cause of action, but "is more of a label used to generally describe more specific claims or causes of action." (Doc. 20, p. 31.) Finally, Anderson asserts that the claim for punitive damages in Count 5 cannot be a stand-alone claim.

## STANDARD OF REVIEW

A motion for judgment on the pleadings is appropriately granted "where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). In considering a motion under Federal Rule of Civil Procedure 12(c), it is analyzed under the same rubric as that of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *See id. See also E.E.O.C. v. Northwest Airlines, Inc.*, 216 F. Supp. 2d 935, 937 (D. Minn. 2002). Under Rule 12(b)(6), the factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), *cited in Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d

849, 851 (8th Cir. 2009). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief. *Id.* (internal citations omitted); *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008). Although Federal Rule of Civil Procedure 8 may not require "detailed factual allegations," it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim must have facial plausibility to survive a motion to dismiss. *Id.* Determining whether a claim has facial plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft*, 556 U.S. at 679.

In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), courts primarily look to the complaint and "'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for summary judgment." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n. 3 (8th Cir. 2012) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

"On a motion to dismiss for breach of contract, courts look not only at the sufficiency of the complaint but also at the contract itself, which by definition is integral to the complaint." *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017). *See also Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss."). A copy of the Agreement is attached as Exhibit A to the Complaint and the Court will consider it.[1]

---

[1] After Andersen filed his motion for judgment on the pleadings, gpac filed two separate declarations with attached exhibits that relate to the Agreement. (Docs. 22 and 26.) Attached to the first declaration as Exhibit A is a document entitled "Account Executive Employment Agreement for Leadership." (Doc. 22-1.) The declaration states that Exhibit A is a copy of an Addendum to Andersen's Agreement, and that it was executed on February 11, 2020. Gpac argues that the Addendum was signed before Andersen moved to Colorado, and that it raises a question

## CHOICE OF LAW

Before addressing the merits of Defendants' motions for judgment on the pleadings, the Court must resolve the dispute over what law applies to gpac's breach of contract claim.[2]

Defendants argue that Colorado law governs the Agreement based on Andersen's residence in Colorado for the majority of his employment with gpac. Defendants assert that the Agreement is unenforceable under Colorado law because the law and public policy in Colorado so strongly disfavor the restrictive covenants in the Agreement.

Defendants point to the following provision of the Colorado Code:

(2) Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:

(a) Any contract for the purchase and sale of a business or the assets of a business;

(b) Any contract for the protection of trade secrets;

(c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;

(d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

---

of fact whether Andersen was "professional staff" of gpac. (Doc. 21, pp. 12-13.) Thus, gpac asserts, even if Colorado law applies, the Colorado statute does not void the Agreement because the law contains an exception allowing non-compete agreements for professional staff.

Six exhibits are attached to the second declaration. (Docs. 26-1- 26-6.) The first exhibit appears to be a duplicate of the January 17, 2019 Agreement attached to the Complaint. (Doc. 26-1.) The declaration explains that Exhibits 2 through 6 are exhibits to the January 17, 2019 Agreement. Those exhibits are dated January 17, 2019, January 28, 2020, February 11, 2020, March 20, 2020, and May 20, 2020. (Docs. 26-2- 26-6.) They appear to pertain to Andersen's compensation for his work with gpac, but gpac does not explain their relevance.

Andersen objects to consideration of gpac's declarations and referenced exhibits in deciding the pending motion "because he cannot in good faith admit or agree that these materials are authentic, genuine, and complete." (Doc. 30, p. 2.) The Court need not reach this issue because it has no need to consider Docs. 22 or 26 in order to rule on Defendants' motions for judgment on the pleadings.

[2] Andersen asserts that gpac's other claims or Counts "do not require a conflict of law analysis because South Dakota and Colorado substantive laws are the same." (Doc. 20, p. 7.) CyberCoders does not argue to the contrary. (Doc. 24.) If no conflict exists, the Court need not engage in a choice of law analysis. *See Prudential Ins. Co. of America v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007).

Colo. Rev. Stat. § 8-2-113(2). Defendants assert that none of the exceptions in Sections 2(a)-(d) apply here, and thus the non-compete covenant in the Agreement is void. Andersen adds that "Colorado's public policy against non-competes is so strong that its Legislature has made it 'unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place he sees fit.'" (Doc. 20, p. 12, citing Colo. Rev. Stat. § 8-2-113(4)).

Andersen's Agreement with gpac includes two provisions that are relevant to Defendants' choice-of-law argument. First, the choice-of-law provision states: "This Agreement, and any controversies, claims, disputes or matters in question arising out of or relating to this Agreement shall be construed, governed, and enforced in accordance with the laws of the State of South Dakota." (Agreement § 16.) Second, the choice-of-forum clause states:

> The sole and exclusive forum for resolving any and all controversies, claims, disputes and matters in question arising out of, or relating to, the employment of the Employee by the Company or the termination of such employment, or this Account Executive Employment Agreement or the breach thereof, or the relations between the parties, arising either during or after the employment relationship, shall be in either the South Dakota Circuit Court for Second Judicial Circuit or the United States District Court for the District of South Dakota, Southern Division.

(Agreement § 17.1.) According to gpac, these provisions require the application of South Dakota law to its breach of contract claim.

In *Broin and Associates, Inc. v. Genencor Intern., Inc.*, 232 F.R.D. 335 (D.S.D. 2005), this Court set forth the general rule applicable to resolving choice of law issues: "When confronted with a conflict of laws issue in a diversity action, a federal district court must apply the conflict of law rules of the forum state." *Id.* at 338 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). *See also Black Hills Truck & Trailer, Inc. v. Mac Trailer Manufacturing, Inc.*, 2015 WL 8483353, *1 (D.S.D. Dec. 9, 2015). In *Miller v. Honkamp Krueger Financial Services, Inc.*, the Eighth Circuit reiterated the rule that, "[i]n determining which state's law applies, we look to the choice of law principles of the forum state." 9 F.4th 1011, 1016 (8th Cir. 2021) (quoting *Am. Fire & Cas. Co. v. Hegel*, 847 F.3d 956, 959 (8th Cir. 2017)). In designating South Dakota law as governing, the *Miller* court determined that "[u]nder South Dakota law, courts honor contractual choice-of-law provisions unless they contravene South Dakota public policy." *Miller*, 9 F.4th at

7

1016 (citing *Dunes Hosp., L.L.C. v. Country Kitchen Int'l, Inc.*, 623 N.W.2d 484, 488 (S.D. 2001)). The South Dakota Supreme Court has stated that "[i]n South Dakota, a stipulation that provides the governing law is permitted." *Dunes,* 623 N.W.2d at 488 (citing *State ex rel Meierhenry v. Spiegel, Inc.*, 277 N.W.2d 298, 299 (S.D. 1979)).

Recognizing that choice of law issues can be complex, South Dakota has turned to the Restatement (Second) of Conflicts to navigate the nuances of Conflicts of Laws. As this court recently noted, "South Dakota applies the provisions of the Restatement (Second) of Conflicts of Laws in order to resolve questions about which state's laws govern in particular factual situations." *Omega Liner Company, Inc. v. Monte Vista Group, LLC*, 2019 WL 4415378, \*5 (D.S.D. Sept. 16, 2019) (citing *Dunes*, 623 N.W.2d at 488 (quoting *Stockmen's Livestock Exch. v. Thompson*, 520 N.W.2d 255, 257 (S.D. 1994))).   Because the Agreement in this case contains a choice of law provision, Section 187 of the Restatement applies.

Restatement of Conflicts (Second) § 187 states:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflicts § 187(1)-(2). As summed up by the court in *Larson Manufacturing Company of South Dakota, Inc. v. Western Showcase Homes, Inc.*, "[t]he Restatement honors choice-of-law clauses contained within contracts unless, either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to

8

a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue. 2018 WL 6528885, at *10-11 (D.S.D. Dec. 11, 2018) (quoting Restatement (Second) of Conflict of Laws § 187 (2)(a)-(b)).

Andersen argues that the second exception under § 187 applies here because "an application of South Dakota law would be contrary to the fundamental public policy of the State of Colorado, and Colorado has a materially greater interest with regard to the particular issues in this case." (Doc. 30, p. 8.) In support of this argument Andersen relies, in part, on *DCS Sanitation v. Castillo*, 435 F.3d 892 (8th Cir. 2006.) There, Nebraska residents sought relief in Nebraska federal court from employment agreements which dictated that Ohio law would govern their employment disputes. *Id.* at 894. The District Court determined both that Nebraska had a materially greater interest in the dispute and that applying Ohio law would violate a fundamental policy of Nebraska law, and therefore declined to apply Ohio law. *Id.* at 895. Factors cited by the court included entering into the Agreements in Nebraska, the services were performed in Nebraska, and further, "the former employees reside in Nebraska, the prohibition of the noncompete clause directly and materially affects employment in Nebraska, and DCS does business in Nebraska." *Id.* at 896. The court also noted the "only relationship between Ohio and the parties is the location of DCS's corporate headquarters and principal place of business in Ohio. The Agreements were not negotiated, entered into, or performed in Ohio." *Id.* Therefore, it was proper to conclude that "Ohio has no substantial relationship to the parties or the transaction, and Nebraska has a greater material interest in the Agreements." *Id.* The Eighth Circuit affirmed, and also addressed the second factor in § 187 of the Restatement, explaining that, "Nebraska and Ohio courts have materially different approaches to the reformation of unreasonable noncompete agreements," such that an Ohio court may reform the agreement, but a Nebraska court may not. *Id.* at 897 (citing *H & R Block Tax Servs., Inc. v. Circle A Enters., Inc.*, 269 Neb. 411, 693 N.W.2d 548, 552 (2005)). As a consequence, "application of Ohio law would violate a fundamental policy of Nebraska law." *Id.* (citing *Rain & Hail Ins. Serv., Inc. v. Casper*, 902 F.2d 699, 700-01 (8th Cir. 1990)).

*DCS Sanitation* is unlike the present case and it does not support application of Colorado law to the Agreement between Andersen and gpac. In *DCS Sanitation*, the forum state rejected the choice of law provision in the contract and instead applied the forum state's law. In the case at bar, Defendants seek the opposite result: rejection of the forum state's law in favor of the law of another state based on the extent of the latter's interest in the dispute.

9

To support their argument that Colorado has a materially greater interest than South Dakota, Defendants point to gpac's transfer of Andersen from South Dakota to live in Colorado and work at gpac's satellite office in Colorado, and gpac's decision to have Andersen and other employees work from their homes in Colorado after it closed the satellite office.  One problem with this information is that Defendants do not cite to any pleadings that allege gpac opened a satellite office in Colorado or that it decided to have Andersen and other employees work from their homes after closing the satellite office, and the Court was unable to find this information in the pleadings.  The Court is not convinced that Colorado has a materially greater interest in the issues related to the Agreement.

Gpac points out the factors that weigh in favor of application of South Dakota law, including the contract provisions choosing South Dakota law, Andersen's execution of the Agreement in South Dakota while he lived and worked in South Dakota at the beginning of his employment, location of gpac's business in South Dakota, including all of its data and customer information, and the fact that South Dakota is the forum state.  Colorado clearly has an interest in the issues relating to the Agreement, but the Court does not find that Colorado's interest is a materially greater interest in the issues.  If Andersen was a resident at all times in Colorado, and signed there, the weighing of interests could change.

The choice of law issue in this case is similar to that in *Emerson Electric Co., v. Rogers*, 418 F.3d 841 (8th Cir. 2005).  A former employee of a Missouri business who had signed an employment agreement providing that Missouri law would govern any employment disputes argued that the federal court in Missouri should apply Georgia law because some of the employee's sales efforts took place there and in several other states.  *Id.* at 847.  The district court rejected the former employee's argument.  In affirming, the Eighth Circuit commented as follows: "Even assuming that Missouri were the default state and that a Georgia court would be more likely to find the covenant unenforceable, there is no indication Missouri lacks all interest in the transaction or that Georgia's interest in the dispute is materially greater than that of Missouri." *Id.* (citing Restatement (Second) of Conflict of Laws § 187 (1971)).  The Eighth Circuit added that the District Court did not err in concluding the "public policy of Missouri encouraged the enforcement of the covenant not to compete," *id.*, nor in "applying Missouri law to determine whether the injunction should be issued." *Id.*

10

Likewise, the Agreement in the present case designates South Dakota courts as the forum and South Dakota law as governing. There is a showing that South Dakota has a substantial relationship to the parties and to the Agreement. In contrast, Defendants have not shown that Colorado's interest is materially greater than that of South Dakota. Thus, the Court will give effect to the choice of law provision unless the public policy of South Dakota dictates otherwise. *See Miller v. Honkamp*, 9 F.4th at 1016 ("Under South Dakota law, courts honor contractual choice-of-law provisions unless they contravene South Dakota public policy.") (citing *Dunes*, 623 N.W.2d at 488)).

There are several sources of public policy in South Dakota. The South Dakota Supreme Court has summarized them as follows: "In South Dakota, '[t]he primary sources for declarations of . . . public policy . . . are the constitution, statutory law, and judicial decisions.'" *Black Hills Truck & Trailer*, 2015 WL 8483353, *1(quoting *Spiegel*, 277 N.W.2d at 300)). In discerning public policy governing contracts, the *Black Hills Truck* court took note that, "[a]ny contract provision which is contrary to an express statute or to the policy of an express statute is unlawful." *Id.* (quoting *Spiegel*, 277 N.W.2d at 300). These comments dovetail with SDCL § 53-9-3 (identifying certain contracts as against public policy).

In *Miller v. Honkamp*, the Eighth Circuit addressed public policy concerns in the context of an employment agreement. 9 F.4th at 1011. The court noted "the South Dakota Supreme Court has made clear that '[t]he general rule against contracts in restraint of a lawful profession, trade, or business is a legislative expression of public policy.'" (quoting *Farm Bureau Life Ins. Co. v. Dolly*, 910 N.W.2d 196, 201 (S.D. 2018)).

Employment contracts are addressed in South Dakota statutes, as well. Pertinent to this case is the following restriction on employment contracts: "Any contract restraining exercise of a lawful profession, trade, or business is void to that extent, except as provided by §§ 53-9-9 to 53-9-12, inclusive." SDCL § 53-9-8. The exception that appears at SDCL § 53-9-11 provides as follows:

… an employee may agree with an employer at the time of employment or at any time during employment not to engage directly or indirectly in the same business or profession as that of the employer for any period not exceeding two years from the date of termination of the agreement and not to solicit existing customers of the employer within a specified county, first- or second-class

11

municipality, or other specified area for any period not exceeding two years from the date of termination of the agreement, if the employer continues to carry on a like business therein.

SDCL § 53-9-11.

As discussed in *Dunes*, the public policy of South Dakota is to permit parties to choose the law that governs their agreements. 623 N.W.2d at 488. The public policy expressed in SDCL § 53-9-8 is that contracts in restraint of trade are disfavored. The public policy expressed in SDCL § 53-9-11, specific to employment agreements, is that a limit of two years is allowed for noncompete and non-solicitation agreements, and geographic restrictions apply. South Dakota has enacted some general rules through statutes, but the courts primarily address the validity of specific provisions of employment contracts on a case-by-case basis. *See, e.g., Raven Industries, Inc. v. Lee*, 783 N.W.2d 844 (S.D. 2010); *Franklin v. Forever Venture, Inc.*, 696 N.W.2d 545 (S.D. 2005); *Setliff v. Akins*, 616 N.W.2d 878 (S.D. 2000). For these reasons, South Dakota public policy does not require that this Agreement's choice of South Dakota law provision be invalidated. Accordingly, the Court will apply South Dakota law to gpac's causes of action in the Complaint, as well as applying South Dakota law on conflicts of law.

Having resolved the choice of law question, the Court now turns to the merits of Defendants' motions for judgment on the pleadings.

## ANALYSIS

### 1. Count 1: Breach of Contract (Andersen)

In its Complaint, gpac claims that Andersen breached four provisions of his Agreement: the confidentiality provision in Section 8, the non-solicitation provision in Section 9, the noncompete provision in Section 10, and the provision prohibiting him from inducing other gpac employees to terminate employment with gpac or violate their contractual obligations to gpac in Section 12.

In South Dakota, "[t]he elements of a breach of contract are (1) an enforceable promise; (2) a breach of the promise; and (3) resulting damages." *Bowes Constr., Inc. v. S.D. Dept. of Transp.*, 793 N.W.2d 36, 43 (S.D. 2010).

12

**Section 8: Confidentiality Provision and Section 12: Inducing gpac Employees**

Andersen argues that gpac's Complaint fails to allege facts showing a violation of the confidentiality provision in Section 8.[3]  Andersen also asserts that gpac failed to allege any facts that he, in fact, engaged in any conduct in violation of Section 12 of the Agreement which prohibits him from inducing other gpac employees to violate their employment contracts.[4]

In response, gpac contends that its Complaint sufficiently alleges conduct by Andersen that breached Sections 8 and 12 of the Agreement, and that the allegations put Andersen on notice of the claims against him and the grounds on which they rest. Gpac points out that Section 8 of the Agreement prohibits disclosure of confidential information, and the Complaint sets out that provision and alleges Andersen breached it.  Furthermore, the agreement not to induce other employees to quit or violate their contracts of employment with gpac, found in Section 12 of the Agreement, is set out in the Complaint, as well as gpac's allegations that Andersen engaged in those prohibited acts.

For purposes of Defendants' motions for judgment on the pleadings, the issue is not whether gpac ultimately will prevail on its claims that Andersen breached Section 8 and Section 12 of the Agreement, but whether it appears beyond doubt that gpac can prove no set of facts in support of its claims which would entitle it to relief.  It is too early to determine whether gpac can show that Andersen committed all of the alleged acts in breach of the Agreement with gpac, but gpac's assertions meet the plausibility standards required to avoid judgment in favor of Defendants on the claims for breach of Sections 8 and 12 of the Agreement.  For these reasons, Defendants are not entitled to judgment in their favor on the claims for breach of Section 8 or Section 12 as they adequately plead causes of action.

---

[3] A covenant not to disclose information, unlike a covenant not to compete, "is free from challenge as a general restraint on trade." *Aqreva, LLC v. Eide Bailly, LLP*, 950 N.W.2d 774, 786 (S.D. 2020). "However, such covenants are strictly construed and enforced only to the extent reasonably necessary to protect the employer's interest in confidential information." *Id.*

[4]  The portion of Andersen's brief addressing the confidentiality provision cites to Section 10 of the Agreement. (Doc. 20, pp. 22-23.)  The Court assumes Andersen meant to cite to Section 12 because the prohibition against inducing other employees is found in Section 12 and not in Section 10 of the Agreement.

Finally, Defendants argue that the non-solicitation provision (Section 9) and noncompete provision (Section 10) of the Agreement are too broad in scope and geographical area and are not enforceable under South Dakota law. South Dakota law provides:

> Except as otherwise provided in § 53-9-11.1, an employee may agree with an employer at the time of employment or at any time during employment not to engage directly or indirectly in the same business or profession as that of the employer for any period not exceeding two years from the date of termination of the agreement and not to solicit existing customers of the employer within a specified county, first- or second-class municipality, or other specified area for any period not exceeding two years from the date of termination of the agreement, if the employer continues to carry on a like business therein.

S.D.C.L § 53-9-11.

### Section 9:  Non-Solicitation Provision

The non-solicitation covenant in Section 9 of the Agreement provides:

> For a period of two years following the effective date of the termination of the Employee's employment, the Employee shall not, in the course of the personnel placement service business, solicit or provide services to any client, interim employee or candidate or solicit for employment or employ any interim employee or candidate, who resides in the United States, and who contacted the Company or had been contacted by the Company for personnel placement service business and shall not assist, directly or indirectly, any other person other than the Company in so doing, provided that the Company remains in the personnel placement service business in the United States.

(Agreement § 9.)

Under South Dakota law, an agreement may restrict an employee from soliciting existing customers within a specified county, first- or second-class municipality, or other specified area for a period of two years after employment. SDCL 53-9-11. Non-solicitation clauses are not a general restraint on trade because "under SDCL § 53-9-8, an agreement not to disclose information or solicit, unlike a covenant not to compete, is free from challenge as a general restraint on trade." *1st Am. Sys., Inc. v. Rezatto*, 311 N.W.2d 51, 57 (S.D. 1981). "Because a non-disclosure clause, unlike a non-compete clause, is not a general restraint on trade in South Dakota, it is not held to the same strict standard as a non-compete clause if the language is too broad." *Billion v. Oxford*, 2016 WL 3976636, at *4 (D.S.D. July 22, 2016). This same reasoning can be applied to non-solicitation clauses, which are more akin to non-disclosure provisions because, while they limit a former employee's ability to solicit certain customers, they do not restrain the former employee from

14

engaging in carrying on any business that they so choose. *Beef Products, Inc. v. Hesse*, 2019 WL 6037424, at *3 (D.S.D. Nov. 14, 2019) (citing *Smith, Barney, Harris Upham & Co., Inc. v. Robinson*, 12 F.3d 515, 518 (5th Cir. 1994)) (finding that non-recruitment covenants do not necessarily restrict a former employee's ability to compete and do not significantly restrain trade).

The two-year restriction on solicitation in Section 9 of the Agreement in this case complies with SDCL § 53-9-11, and thus on its face it appears to be a reasonable duration. However, Section 9 does not contain a geographical restriction and it appears to apply throughout the United States. Indeed, gpac alleges in the Complaint that Section 9 prohibits Andersen from soliciting clients and candidates "anywhere within the United States, as gpac's business is national in scope." (Doc. 1-1, Complaint, § 5.)

The South Dakota Supreme Court has held that "agreements which are unreasonable as to the period of restriction or the area encompassed may be partially enforced." *Walling Chem. Co. v. Bigner*, 349 N.W.2d 647, 650 (S.D. 1984) (citing *Rezatto*, 311 N.W.2d at 56). The nondisclosure clause in the employment agreement at issue in *Walling* lacked a territorial limitation.[5] The court applied a three-prong reasonableness test to determine the enforceability of the nondisclosure clause: "[A] covenant is reasonable only if it (1) is no greater than required for the protection of the employer, (2) does not impose undue hardship on the employee and (3) is not injurious to the public." *Walling*, 349 N.W.2d at 650 (citing *Rezatto*, 311 N.W.2d at 59). The court in *Walling* assumed that the geographical area for the nondisclosure agreement was the same area within which the former employee had been authorized to represent the former employer, and the court held that restriction to be reasonable. *Walling*, 349 N.W.2d at 650.

If a non-solicitation provision, or other restrictive covenant, exceeds the scope as authorized by the applicable statute or common law rule, the proper remedy is for a court to only enforce those terms that are compliant with the statute. *See, e.g., Ward v. Midcom, Inc.*, 575 N.W.2d 233, 238 (S.D. 1998) (discussing "partial enforcement" doctrine). Although limited facts are available at this stage in the litigation, it appears that a 200 mile limitation from the home office in Sioux Falls, South Dakota is a reasonable limitation in which to restrict Andersen's solicitation of business. *See, e.g, Rezatto*, 311 N.W.2d at 59 (remanding for the trial court to set a reasonable

_____

[5] The nondisclosure clause prevented sales representatives from using Walling's confidential customer information.

duration for non-solicitation clause). It should be noted that a 200 mile limitation would diminish the competing interest Colorado has in this Agreement.

One final matter regarding the non-solicitation clause involves gpac's interpretation of Section 9 as prohibiting Andersen from soliciting both its "current and prospective clients and candidates." (Doc. 1-1, Complaint, § 5.) In *Rezatto*, the South Dakota Supreme Court held that covenants against *accepting* the former employer's customers and against soliciting the former employer's *prospective* customers were overbroad, and thus it struck down those portions of the contract because they placed an undue burden on the former employee and the public. 311 N.W.2d at 59. *See also Miller v. Honkamp*, 9 F.4th at 1017 (holding that South Dakota law prohibits an agreement not to accept unsolicited business). Accordingly, the non-solicitation clause in Section 9 of the Agreement is unenforceable to the extent that it prevents Andersen from accepting business from gpac's former customers and soliciting gpac's prospective customers.

## Section 10: Noncompete Provisions

The noncompete provisions in Section 10 of the Agreement provide:

10. RESTRICTIVE COVENANTS.

10.1. For a period of two years following the effective date of termination of Employee's employment, and provided that the Company continues to remain the personnel placement service business, the Employee shall not:

10.1.1. engage in the activities of an Account Executive, outside sales representative, coordinator, research assistant, project coordinator, manager, or trainer in the personnel placement service business within a two hundred mile radius of the Office, any Remote Office, or any Home;

10.1.2. provide any personnel- placement-services to any person or company who or which is located within a two hundred mile radius of the Office, any Remote Office, or any Home;

10.1.3. have any ownership interest in any personnel placement service business which is located within a two hundred mile radius of the Office, any Remote Office, or any Home.

Under South Dakota law, a contract is void if it restricts an individual from working in a lawful profession, trade, or business. SDCL 53-9-8. A statutory exception applies to non-compete agreements between an employer and an employee. SDCL 53-9-11. A non-compete is only

enforceable if it strictly complies with the statute by including geographical and temporal limits. *American Rim & Brake, Inc. v. Zoellner*, 382 N.W.2d 421, 424 (S.D. 1986).

The noncompete provisions in Section 10 of the Agreement appear to include more territory than that allowed by South Dakota law. The South Dakota Supreme Court has adopted a practice of revising non-compete agreements when necessary to bring them in compliance with the statutory restrictions placed on restraints of trade by the South Dakota Legislature. For example, in *Simpson v. C&R Supply, Inc.*, 598 N.W.2d 914 (S.D. 1999), the South Dakota Supreme Court held invalid a covenant not to compete "within any county in the United States." The court modified the noncompete "by reducing the boundaries to include only those markets within the city limits of Sioux Falls" *Id.* at 920. *See also Loescher v. Policky*, 173 N.W.2d 50, 53-54 (S.D. 1969) (enforcing non-compete that exceeded the statutory geographical and temporal limits to the extent it complied with the statutory language).

It appears that gpac in essence urges that Andersen should be restricted from competing in a similar business anywhere in the United States. Courts tend to be "skeptical" of nationwide restrictions on competition. *See, e.g., Intermetro Industries Corp. v. Kent*, 2007 WL 1140637, *6 (M.D. Pa. 2007) (citing *National Business Services, Inc. v. Wright*, 2 F. Supp. 2d 701, 708 (E.D. Pa 1998) ("nationwide covenants are disfavored")). Courts faced with such restrictive covenants engage in an extensive review of the facts. *See, e.g., Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 2009 WL 159182 (W.D. Pa. 2009).

The noncompete provisions in the Agreement also appear to prohibit more activities than necessary. The statutory limits of a noncompete agreement only allow the employee to agree "not to engage directly or indirectly in the same business or profession as that of the employer." SDCL § 53-9-11. The South Dakota Supreme Court has stated that when reading an exception to the public policy against restraints of trade, "we must construe it narrowly so as to promote the proscription against general restraints on trade." *American Rim & Brake*, 382 N.W.2d at 424 (S.D.1986) (discussing the exception found at SDCL 53–9–11) (citing *Rezatto*, 311 N.W.2d at 55). The South Dakota Supreme Court has further instructed that "[w]hether the business actually detrimentally competes will depend on the facts of a particular case." *Franklin v. Forever Venture*, 696 N.W.2d at 549. In *Franklin*, the court found the noncompete at issue overly broad, but enforced it to the extent allowed by statute. *Id.*

17

The two-year restriction on competition in Andersen's Agreement with gpac complies with SDCL § 53-9-11. It is unclear whether the employment activities and the geographical scope of the Agreement comply with South Dakota law, and those are matters that may be resolved in later proceedings. Though the scope of the activities and area restricted appear to be overbroad, Defendants have not cited authority establishing that overbreadth is a basis for rendering a noncompete agreement completely unenforceable under South Dakota law.

For all of the reasons set forth above, the Court denies the motions for judgment on the pleadings as to the breach of contract claim in Count 1 of the Complaint.

### 2. Count 2: Misappropriation of Trade Secrets

Gpac also alleges that Andersen and CyberCoders misappropriated its trade secrets, and it asserts a claim against Defendants under the Uniform Trade Secrets Act, SDCL chapter 37-29 ("the UTSA"). Defendants argue that gpac has not identified any trade secrets or plausibly alleged that any misappropriation occurred, and that they are entitled to judgment in their favor.

SDCL § 37-29-1 defines Misappropriation of Trade Secrets in pertinent parts as follows:

…(2) "Misappropriation,"

(i)    Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(ii)   Disclosure or use of a trade secret of another without express or implied consent by a person who:

  (A) Used improper means to acquire knowledge of the trade secret; or

  (B) At the time of disclosure or use, knew or had reason to know that such knowledge of the trade secret was: (I) Derived from or through a person who had utilized improper means to acquire it; (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

…(4) "Trade secret," information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

  (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

18

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

In *Aqreva, LLC v. Eide Bailly, LLP*, the South Dakota Supreme Court addressed a claim for misappropriation of trade secrets in the context of a motion for summary judgment. 950 N.W.2d 774, 789 (S.D. 2020). The court reiterated the rule that "[t]he existence of a trade secret is a mixed question of law and fact." *Id.* (quoting *Paint Brush Corp., Parts Brush Div. v. Neu*, 599 N.W.2d 384, 389 (S.D. 1999)). The court explained further that "[t]he legal question is whether the information in question could constitute a trade secret under the first part of the definition of a trade secret under S.D.C.L. § 37-29-1(4)." *Id.* (citing *Daktronics, Inc. v. McAfee*, 599 N.W.2d 358, 361 (S.D. 1999)). The court then proceeded to divide its task into two parts: "we first determine, as a matter of law, whether the alleged secret constitutes 'information, including a formula, pattern, compilation, program, device, method, technique or process.'" *Id.* The court stated the second part of its endeavor was a "factual inquiry" that "involves the remaining subsections of S.D.C.L. § 37-29-1(4)(i) and (ii)." *Id.*

In the present case, gpac alleges that its "confidential information is highly confidential" and has "independent economic value from not being generally known to competitors" or to others. (Doc. 1-1, Complaint, p. 4, ¶ 23). A long list of gpac's "confidential information" is found in the Agreement, and the information is referred to as "trade secrets." (Agreement § 1.12.) Gpac alleges that if its confidential information were known to competitors "it would be of economic value to them." (Complaint, p. 4, ¶ 23.) Gpac asserts it has tried to maintain the secrecy of this information, *id.* ¶ 24, that the information qualifies as a trade secret, *id.*, ¶ 25, and that Defendants have "used, disclosed, or misappropriated" trade secrets "in a manner that has harmed" gpac. (*Id.*, ¶ 26.) Gpac further alleges the use or disclosure of trade secrets has violated the Agreement. (Doc. 1-1, Complaint, p. 3, ¶ 17, citing § 8 of Agreement). The Agreement reveals that employees acknowledge they have access to proprietary and confidential information (Agreement §§ 3.2 and 3.3), and they agree not to disclose proprietary information either before or after employment with gpac (*id.* at § 8.2).

The Agreement, which is integral to the Complaint, lists what gpac considers to be trade secrets. Gpac alleges that Andersen had access to the trade secrets and that Andersen and CyberCoders have used or disclosed that information. These allegations suffice to state a plausible claim of trade secret misappropriation against Defendants, and to avoid judgment in favor of Defendants

on this claim. *See, e.g., Sterling Computers Corp. v. Haskell*, 2018 WL 671210, at \*4 (D.S.D. Feb. 1, 2018) ("'All that is required at this [motion to dismiss] stage of the proceedings is an allegation that [the defendant] misappropriated ]the plaintiff's] trade secrets sufficient to put the defense on notice as to the nature of the claim.'"). The Court denies Defendants' motions for judgment in their favor on the claim for misappropriation of trade secrets in Count 2.

### 3. Count 3: Tortious Interference with Contract (CyberCoders)

Because CyberCoders is not a party to the Agreement, gpac brought a tortious interference with contract claim against CyberCoders for third party interference with the Agreement. Cyber-Coders seeks judgment in its favor on gpac's claim against it for tortious interference with contract. The elements of tortious interference with contract are: (1) the existence of a valid contractual relationship; (2) intentional interference with the relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the relationship, and (6) damages. *Gruhlke v. Sioux Empire Fed. Credit Union, Inc.*, 756 N.W.2d 399, 406 (S.D. 2008).

CyberCoders first argues that the tortious interference claim is moot because the Agreement signed by Andersen is not valid or enforceable. This argument fails because the Court has held that the breach of contract claim survives Andersen's motion for judgment on the pleadings.

Next, CyberCoders contends that there are no allegations of any "improper means" or an "improper purpose" in CyberCoders' employment of Andersen. In its Complaint, gpac alleges that CyberCoders had knowledge of gpac's contractual rights to confidentiality, non-competition, non-solicitation, and non-interference set forth in the Agreement, as well as Andersen's obligations to gpac under the Agreement. (Doc. 1-1, Complaint, p. 5, ¶¶ 29-30.) Gpac asserts that, despite this knowledge, CyberCoders "intentionally and unjustifiably interfered with gpac's rights under the Agreement by . . . engaging in business or other acts and omissions with [Andersen] in breach of [Andersen's] obligations under the Agreement."

Gpac's allegations, while sparse, are sufficient to lead to the inference that CyberCoders intentionally interfered with the Agreement by employing Andersen, and that the interference caused gpac harm. Thus, gpac has pleaded a plausible claim for tortious interference with contract, and CyberCoders' motion for judgment in its favor is denied as to Count 3.

4.   **Count 4:  Unfair Competition**

Gpac claims that both Defendants engaged in the tort of unfair competition. As this Court has noted previously, in South Dakota the tort of unfair competition does not have specific elements. *Copperhead Agricultural Products, LLC v. KB Ag Corp., LLC*, 2019 WL 7038241, \*7 (D.S.D. Dec. 20, 2019) (quoting *Setliff,* 616 N.W.2d at 887). Rather, the concept of unfair competition "describes a general category of torts which courts recognize for the protection of commercial interests." *Setliff*, 616 N.W.2d at 887.  The *Setliff* court acknowledged that "tortious interference can be the basis for a claim for unfair competition." *Id.* at 888 (citing *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 631 (Minn. 1983)).

Gpac claims unfair competition by Defendant Andersen's "employment or service relationship with [CyberCoders] in violation of the Agreement."   (Doc 1-1, Complaint, p. 5, ¶ 35). While insufficient on its own, this assertion is sufficient when coupled with the Agreement and the allegations of tortious interference discussed above.  Because the tortious interference can be the basis for unfair competition, gpac's pleading is sufficient to avoid dismissal, and Defendants' motion for judgment on the pleadings is denied as to Count 4.

5.   **Count 5:  Punitive Damages**

Gpac's final claim is for punitive damages. Andersen argues that a claim for punitive damages is not a stand-alone claim; rather, punitive damages are a measure of recovery derivative of a separate legal claim.  According to Andersen, the entry of judgment in his favor on Counts 1 through 4 requires the dismissal of Count 5.

Andersen is correct that there is no freestanding cause of action for punitive damages under South Dakota law. *See Olson-Roti v. Kilcoin*, 653 N.W.2d 254, 259 (S.D. 2002) ("This Court has stated that punitive damages are allowable only when supported by a cause of action.") (citing *Henry v. Henry*, 604 N.W.2d 285, 288 (S.D. 2000)).  However, gpac has sufficiently pleaded Counts 1 through 4, and therefore separate legal claims exist in Counts 2 through 4 as a basis to recover punitive damages. The punitive damages claim will be considered to be a damage claim and a part of the prayer for relief but will not be considered to be a separate cause of action. Accordingly,

**IT IS ORDERED:**

1. That Defendant Blake Andersen's Motion for Judgment on the Pleadings is denied (Doc. 19);

2. That Defendant CyberCoder's Motion for Judgment on the Pleadings is denied (Doc. 24).

Dated this ___ day of May, 2022.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK